UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOANNE JOHNSON, Individually and as
Personal Representative of the Estate of
Sammie Lee Johnson, deceased, and
ANTONIO RECHE JOHNSON,

        Plaintiffs,

v.                                        Case No.  8:03-cv-2011-T-24TBM

UNITED STATES OF AMERICA,

        Defendant.
_____/

**MEMORANDUM OPINION**

This matter came on for trial before the Court sitting without a jury on August 22 - 29, 2005.  This Court has jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) and §§ 2671-2680.

**I.     Procedural History**

The complaint in this case was filed on September 25, 2003 by Plaintiffs Joanne Johnson, individually and as personal representative of the Estate of Sammie Lee Johnson, deceased, and Antonio Reche Johnson (hereinafter collectively referred to as "Plaintiff") and includes claims for wrongful death and medical malpractice.  The United States filed its answer and affirmative defenses on January 30, 2004.

**II.    Findings of Fact and Conclusions of Law**

After consideration of the evidence presented at trial, the arguments of counsel presented at trial, and any legal authorities submitted to the Court, the Court makes the following findings

of fact and conclusions of law.  To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any conclusions of law constitute findings of fact, they are adopted as such.

    A.  <u>Findings of Fact</u>

Decedent Sammie Lee Johnson, age 47, was first seen at the Bay Pines Veterans Administration Medical Center ("Bay Pines VA") on November 15, 2001 when he was admitted with a facial droop and difficulty speaking.  Mr. Johnson was diagnosed with a brain stem infarct, commonly known as a stroke.  (Plaintiff's Exhibit 2, Bay Pines VA Record 64).[1]

Mr. Johnson's blood glucose was tested on November 15, 2001 and again on November 18, 2001 and measured 107 mg/dL and 117 mg/dL, respectively.  (Bay Pines VA Record 8, 14). A fasting serum glucose level of up to 110 mg/dL is considered normal.  (Doc. No. 78 at 2; Doc. No 80 at 2).  Mr. Johnson's Bay Pines VA records do not indicate whether Mr. Johnson's glucose tests were fasting or non-fasting.  (Bay Pines VA Records 8, 14).  However, Dr. Gregory Scott Linden, Mr. Johnson's primary care physician, testified at trial that the November 18, 2001 blood glucose level result (117mgdL) was from a non-fasting test; therefore, this test result was not relevant in determining whether Mr. Johnson's blood glucose level was within the normal range. Mr. Johnson was discharged from Bay Pines VA on November 20, 2001 with medications to control his high blood pressure and hyerlipidemia.  (Bay Pines VA Record 44).  During his admission at Bay Pines VA, Mr. Johnson did not report a history of diabetes.  (Doc. No. 78 at 2;

---

[1] Plaintiff's Exhibit 2 is the entire Bay Pines VA Medical Record for Sammie Lee Johnson and is referred to hereinafter as "Bay Pines VA Record" followed by the page number stamped on the bottom of the page.

Doc. No. 80 at 2).

On November 30, 2001, Mr. Johnson went to Bay Pines VA for a follow up appointment and was seen for the first time by Dr. Gregory Scott Linden, who was employed by BayPines VA as a physician. (Bay Pines VA Record 32,33). Dr. Linden assessed that Mr. Johnson had uncontrolled high blood pressure and hypertension. (Bay Pines VA Record 32). Mr. Johnson's blood pressure was elevated at 180/110. Dr. Linden provided Mr. Johnson with a blood pressure cuff to check his blood pressure, instructed him to call Dr. Linden if his blood pressure exceeded certain limits, and sent him home. (Bay Pines VA Record 32).

Also on November 30, 2001, because Mr. Johnson posed certain risk factors for the development of diabetes, Dr. Linden ordered two diagnostic blood tests, a fasting comprehensive metabolic panel ("cmp") and a hemoglobin A1C ("hgl A1C"). Dr. Linden ordered that these tests be completed within six weeks, and Mr Johnson was scheduled for the testing at Bay Pines VA on January 11, 2002. Mr. Johnson did not keep his scheduled appointment on January 11, 2002 and these tests were not done. (Doc. No. 78 at 4; Doc. No. 80 at 3-4).

On January 18, 2002, Mr. Johnson went to Bay Pines VA, as a walk-in, complaining of vision problems. (Bay Pines VA Record 25). Although Joanne Johnson, Mr. Johnson's wife, testified that her husband told her that he was experiencing blurry vision, Dr. Linden testified that Mr. Johnson's only complaint was that of double vision, not blurry vision. Dr. Linden testified that he examined Mr. Johnson because he thought Mr. Johnson's vision problems might be related to, or an extension of, his previous stroke. Dr. Linden ordered that an appointment at the eye clinic be scheduled for Mr. Johnson for the following Wednesday, January 23, 2002. (Bay Pines VA Record 25). Dr. Linden also reordered the hgl A1C and the cmp blood tests for

the following week.

After he examined Mr. Johnson, Dr. Linden noticed on a nurse's routing slip that Mr. Johnson had also complained of a urinary problem. Mr. Johnson had not complained of a urinary problem during Dr. Linden's examination. Dr. Linden then went to the waiting room and asked Mr. Johnson if he was having any urinary problems. Mr. Johnson then told him that he was experiencing a burning sensation while urinating. Upon learning this, Dr. Linden instructed Mr. Johnson to go to the lab at Bay Pines VA and give a urine sample for analysis. Mr. Johnson's urine specimen was collected at 10:38 a.m. on Friday, January 18, 2002, and it was analyzed by the dipstick method. (Bay Pines VA Record 15, Plaintiff's Exhibit 18). Later that day, Mr. Johnson's urinalysis results were posted to Mr. Johnson's computerized patient chart.[2] (Plaintiff's Exhibit 18). Mr. Johnson's urine glucose level was greater than 1,000 mg/dL and had urine ketones of 15 mg/dL. (Bay Pines VA Record 15). A urine glucose level of greater than 1,000 mg/dL is an abnormal test result. (Doc. No. 78 at 5; Doc. No. 80 at 5).

Dr. Linden was not notified by the Bay Pines VA's laboratory of Mr. Johnson's abnormal urine results on January 18, 2002, nor did the VA computer system, VistA, immediately alert Dr. Linden to the abnormal test results. Dr. Linden testified that he first reviewed Mr. Johnson's urine test results, which were posted in his computerized patient chart, on Monday, January 21, 2002. (Plaintiff's Exhibit 18).

On Saturday, January 19, 2002, the day after Mr. Johnson's walk-in visit to Bay Pines VA, Mr. Johnson was admitted to Bayfront Medical Center ("Bayfront") at 7:50 p.m.

---

[2] Bay Pines VA's computerized patient record system is called the Veterans Health Information Systems and Technology Architecture, or VistA. (Plaintiff's Exhibit 15 at 4).

complaining of chest pains, weakness, and confusion. (Defendant's Exhibit 2A). Mr. Johnson was diagnosed with a myocardial infarct, commonly known as a heart attack, and overt diabetes mellitus. (Plaintiff's Exhibit 2, Bayfront Record 2).[3] Mr. Johnson was also diagnosed as suffering from diabetic ketoacidosis, and his blood glucose level was elevated at 1226 mg/dL (Bayfront Record 49, Defendant's Exhibit 2D).

Dr. John Orban, Defendant's medical expert witness and the medical director of the emergency department at Tampa General Hospital, testified that diabetic ketoacidosis, or DKA, refers to a condition that occurs when a diabetic's blood sugars become too high and the body produces ketones, which are a by-product of fatty acids. He testified that DKA is treated by administering insulin.

Bayfront placed Mr. Johnson on an intravenous insulin ("IV") drip due to his high blood glucose level. The initial IV access was lost and doctors at Bayfront decided to insert a femoral vein catheter in order to administer insulin. While attempting to insert the femoral vein catheter, the Bayfront doctors lacerated Mr. Johnson's vein. This laceration led to a massive internal hemorrhage, and on January 22, 2002, Mr. Johnson died as a result of a voluminous loss of blood.

B.   Conclusions of Law

Plaintiff asserts that: (1) Dr. Gregory Scott Linden violated the standard of care in his treatment of Mr. Johnson; (2) Bay Pines VA violated the standard of care by failing to promptly notify Dr. Linden of Mr. Johnson's abnormal urinalysis results on January 18, 2002; and (3) Dr.

---

[3] Plaintiff's Exhibit 2 is the entire Bayfront Medical Record for Sammie Lee Johnson and will be referred to hereinafter as "Bayfront Record" followed by the page number stamped on the bottom of the page.

Linden's and/or Bay Pines VA's violation of the standard of care resulted in Mr. Johnson's hospitalization at Bayfront on January 19, 2002, where he died on January 22, 2002 receiving treatment he should have received earlier at Bay Pines VA.

        1.      Standard of Care for Bay Pines VA

Plaintiff brings this action pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) and §§ 2671-2680. Section 1346(b)(1) provides that the United States is liable for the personal injuries and damages caused by government employees while acting within the scope of their employment, "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). In this case, the alleged acts or omissions took place at Bay Pines VA Medical Center in Bay Pines, Florida. Accordingly, the law of the State of Florida applies to Plaintiff's claims of medical negligence.

"To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." Gooding v. University Hospital Building, Inc., 445 So.2d 1015,1018 (Fla. 1984). Pursuant to Florida Statute § 766.102(1), "[t]he prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Plaintiff has the burden of proving by a greater weight of the evidence that the actions of the health care provider breached the acceptable standard of care. See id.

            a.      Urinalysis Results as a Critical Value

Plaintiff claims that Bay Pines VA's failure to include abnormal urine test results as a critical value violated the acceptable standard of care. Critical values are laboratory test results that are at such a variance with normal results as to be life threatening if not immediately treated. (Trial testimony of Dr. George Lundberg).  Most hospitals and laboratories have a system of notification based on critical values. (Trial testimony of Dr. Lundberg).  Abnormal test results that are listed as a critical value at Bay Pines VA are specially flagged or otherwise highlighted in the VistA system so as to bring the lab test result to the immediate attention of the ordering physician. Bay Pines VA does not include urine test results on its critical values list. Since Bay Pines VA does not include urine test results on its critical value list, Mr. Johnson's abnormal urine test results, which indicated a urine glucose level greater than 1,000 mg/dL, were routinely placed into Mr. Johnson's computerized patient chart and were not specially flagged or brought to Dr. Linden's immediate attention.

Plaintiff's experts Dr. Edward Willey and Dr. George Lundberg testified that in their opinion, Bay Pines VA's failure to include urine test results with a urine glucose value greater than 1,000 mg/dL as a critical value violated the acceptable standard of care.  Plaintiff's experts Dr. Willey and Dr. Edward Shahady [4] testified that there is a correlation between a high urine glucose level and a high blood glucose level, and since high blood glucose levels can be dangerous, and high urine glucose correlates to high blood glucose, Bay Pines VA should have included high urine glucose levels on its critical value list.  However, neither Dr. Willey nor Dr. Shahady could identify any laboratory or hospital that includes urine glucose results as a critical

---

[4] Dr. Edward John Shahady is a primary care physician operating as an independent contractor with the Florida Academy of Family Physicians.

value. East Texas Medical Center was the only medical facility identified by any of Plaintiff's witnesses as a facility that includes urine glucose results as a critical value. (Plaintiff's Exhibit 5E).

Defendant's experts Dr. John Orban and Dr. Kenneth Emancipator testified that they were unaware of any laboratory or hospital in the country that includes urine test results with a glucose value greater than 1,000 mg/dL as a critical value. Dr. Orban testified that urinalysis results are not included on the critical value list, because a urinalysis is merely a screening test and is notoriously inaccurate. Furthermore, Defendant's experts Dr. Orban and Dr. Emancipator testified that there is no direct correlation between high urine glucose levels and high blood glucose levels. Specifically, Dr. Orban testified that many of his patients who had a urine glucose level of greater than 1,000 mg/dL have had a normal blood glucose level.

Although Plaintiff's experts testified that Bay Pines VA's decision not to include abnormal urine glucose results as a critical value violated the accepted standard of care; Defendant's experts testified that it did not. Plaintiff's experts were only able to identify one laboratory or medical facility in the country that includes urine glucose results as a critical value. If it were a violation of the accepted standard of care not to include abnormal urine tests on the critical values list, more than one hospital or medical facility would do so. Moreover, Bay Pines VA's laboratory is accredited by CAP, which sets the prevailing standard of care for laboratories throughout the United States. (Trial testimony of Robert Phillips). Plaintiff bears the burden of proof and to carry that burden she must introduce evidence sufficient to establish that it is more likely than not that failure to include abnormal urine glucose results as a critical value violates the accepted standard of care. She has not done so.

      b.      Secondary Notification System

Plaintiff also claims that Bay Pines VA violated the acceptable standard of care by not having in place a notification system, other than the critical values list, that would have immediately notified Dr. Linden of Mr. Johnson's abnormal urine test results on January 18, 2002. Dr. Linden, who on January 18, 2002 had only been working at Bay Pines VA for approximately four months, did testify that he had expected that he would have received immediate notification of a urine glucose result of over 1,000 mg/dL and was unaware that Bay Pines VA did not provide such immediate notification. Plaintiff's expert, Dr. Lundberg, testified that in his opinion Bay Pines VA should have had another system of notification in place, apart from including high urine glucose test results on the critical values list, that would have promptly notified Dr. Linden of Mr. Johnson's high urine glucose test results; and failure to have such a secondary notification system was a violation of the acceptable standard of care. However, Dr. Lundberg failed to identify any hospital or any laboratory that had such a secondary notification system in place.

Defendant's experts Dr. Orban and Dr. Emancipator testified that they were unaware of any hospital or laboratory that had in place a secondary notification system. Furthermore, they testified that it was reasonable and within the acceptable standard of care for Dr. Linden not to have received the results of Mr. Johnson's urinalysis performed on Friday, January 18, 2002 until Monday, January 21, 2002, which was the next business day.

A secondary notification system may well be a good idea. However Plaintiff did not identify a single laboratory or medical facility that has a secondary notification system in place. In addition, the experts differ as to whether the failure to have a secondary notification system is

9

a violation of the acceptable standard of care.  Again Plaintiff has failed to carry her burden of proof.

      c.  Bay Pines VA's Internal Laboratory Procedures

Plaintiff claims that Bay Pines VA violated the acceptable standard of care by violating its own internal procedures.  The Department of Veterans Affairs has a handbook entitled "Pathology and Laboratory Medicine Service Procedure," which addresses  the procedures for laboratories at all VA facilities.  (Plaintiff's Exhibit 15).  The handbook states in pertinent part :

> 1. Review processes for electronic data transmission.  For example, programs must be developed so that the VistA computer system checks the entered data against predefined limits established by the Chief or Director, Pathology and Laboratory Medicine Service, for such tests that are identified and flagged with high, low and critical values.  Entries or results outside of the predefined limits will not be accepted.
> b. All significant abnormalities must be identified by an audible "beep" and a visual "flag" observed next to the test values.

(Plaintiff's Exhibit 15 at 13).  Plaintiff argues that Bay Pines VA failed to follow the procedures set forth in the VA handbook.  Plaintiff, however, fails to sustain her burden of proof on this issue.

 Plaintiff gives no legal basis for the argument that a violation of an institution's internal procedures is *ipso facto* a violation of the accepted standard of care. While Plaintiff's expert, Dr. Willey, testified that in his opinion Bay Pines VA's VistA notification system did not comply with the VA handbook because a high urine glucose level is a significant abnormality that is not flagged, defense witnesses testified differently.  Susan Tanner, who works in the Information Medical Resource Area of Bay Pines VA and helps maintain the VistA computer system and trains employees on the VistA system, testified that the "significant abnormalities" referenced in

the VA handbook refers to the critical values list. Therefore, abnormal urinalysis results are not specially flagged, because they are not included on the Bay Pines VA's critical values list. Defendant's expert, Dr. Emancipator, testified that he interpreted the VA handbook to give the chief pathologist the discretion to determine which tests should be included as significant abnormalities that must be flagged.

The Court finds that Plaintiff's expert's (Dr. Willey's) interpretation of the VA handbook to require high urine glucose levels to be flagged does not deserve any greater weight than that of Defendant's expert's (Dr. Emancipator's) interpretation that it should be left to the chief pathologist to determine which tests should be flagged. Accordingly, the Court finds that Plaintiff has not proven by the greater weight of the evidence that Bay Pines VA failed to follow it own internal procedures.

  2. Standard of Care for Dr. Gregory Scott Linden

Plaintiff claims that Dr. Linden violated the accepted standard of care in his treatment of Mr. Johnson. As previously stated, "[t]he prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Florida Statutes § 766.102(1).

    a. Timing of Diagnostic Blood Tests

Dr. Linden, who was employed by the BayPines VA as a physician, saw Mr. Johnson on November 30, 2001 and on January 18, 2002. (Defendant's Exhibits 7-9). On November 30, 2001, Dr. Linden ordered two diagnostic blood tests, a fasting cmp and a hemoglobin A1C to test Mr. Johnson for possible diabetes. He ordered that these tests be completed within six weeks.

(Defendant's Exhibit 6).

Plaintiff's expert, Dr. Shahady, testified that Mr. Johnson's Bay Pines VA records indicated that he had metabolic syndrome, a constellation of symptoms which can lead to the development of diabetes and heart disease. Therefore, Dr. Linden should have ordered that the two blood diagnostic tests be completed immediately, not within six weeks. On the other hand, Defendant's expert, Dr. Orban, testified that his review of Mr. Johnson's Bay Pines VA medical records indicated that as of November 30, 2001, Mr. Johnson had recently undergone two diagnostic blood tests, one on November 15, 2001 and the other on November 18, 2001. The results of these tests did not indicate that Mr. Johnson was suffering from diabetes. Therefore, Dr. Orban opined that given the prior blood test results, there was no emergency that would have required that the tests be completed sooner than within a six week time frame. Clearly the experts differed in their opinions as to whether Dr. Linden violated the acceptable standard of care by not ordering the diagnostic blood tests sooner than within six weeks.

            b.        Failure to Use an Accustick or Finger Prick Test

Dr. Shahady testified that in his opinion Dr. Linden violated the accepted standard of care on November 30, 2001 and again on January 18, 2002, because Dr. Linden did not test Mr. Johnson's blood glucose level using an accustick, or finger prick. Dr. Shahady opined that if Dr. Linden had tested Mr. Johnson's blood glucose by using an accustick, Dr. Linden would have immediately discovered that Mr. Johnson's blood glucose level was high, and he could have immediately started Mr. Johnson on treatment to lower his high blood glucose level. On the other hand, Defendant's expert, Dr. Orban, testified that Dr. Linden certainly could have tested Mr. Johnson's blood glucose level with an accustick on November 30, 2001 and again on

January 18, 2002, but it was not required, and the failure to do so did not violate the acceptable standard of care because Mr. Johnson was not manifesting any diabetic symptoms. Again there is a difference in opinion among the experts as to whether the failure of Dr. Linden to do an accustick test was a violation of the acceptable standard of care.

        c.        Failure to follow up on the January 18, 2002 Urine Test

Dr. Shahady testified that in his opinion Dr. Linden violated the acceptable standard of care by not immediately following up on the results of Mr. Johnson's January 18, 2002 urine test. Dr. Shahady concluded that Dr. Linden's failure to do so led to Mr. Johnson's hospitalization at Bayfront, and therefore contributed to his death. Dr. Orban, on the other hand, testified that since a urinalysis is just a screening test, it is normal and not a violation of the acceptable standard of care that Dr. Linden did not immediately follow up on this test, and it is also normal that the results were not made know to Dr. Linden until the following business day. Furthermore, Plaintiff's own expert, Dr. Edward Willey, testified that considering the information known to Dr. Linden at the time he knew it, Dr. Linden did not violate the acceptable standard of care as to his treatment of Mr. Johnson

Plaintiff has failed to prove by the greater weight of the evidence that Dr. Linden violated the acceptable standard of care in his treatment of Mr Johnson. At best Plaintiff has shown that there is a difference in opinion among the experts as to whether Dr. Linden's treatment of Mr. Johnson violated the acceptable and appropriate standard of care for a treating physician

    3.    <u>Causation</u>

Since Plaintiff has failed to show by the greater weight of the evidence that Dr. Linden or

Bay Pines VA violated the accepted standard of care in their treatment of Mr. Johnson, the Court need not address the issue of causation. However, the evidence is clear that even if Dr. Linden and/or Bay Pines VA had violated the acceptable standard of care in their treatment of Mr. Johnson, Plaintiff has failed to establish that such violation was a substantial factor contributing to Mr. Johnson's death. In Florida, a plaintiff "'must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough.'" Gooding, 445 So.2d at 1018 (quoting Prosser, Law of Torts § 41). Furthermore, "when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced" a plaintiff has failed to establish causation. Jackson County Hospital Corporation v. Aldrich, 835 So.2d 318, 327 (Fla. 1st DCA 2002)(citation omitted).

There is no dispute that the cause of Mr. Johnson's death was a massive internal hemorrhage or as the experts testified "he bled out." On January 21, 2002, while Mr. Johnson was hospitalized at Bayfront, doctors lacerated a vein while inserting a femoral vein catheter. This laceration caused a massive amount of blood loss, which directly led to Mr. Johnson's death. Plaintiff's theory of causation as opined by Plaintiff's experts, Dr. Willey and Dr. Shahady, is that if Mr. Johnson had received proper treatment at Bay Pines VA on January 18, 2002, he would never have needed to be admitted to Bayfront on January 19, 2002 and would not have needed a femoral vein catheter as part of his treatment and therefore would not have bled to death on January 22, 2002 because the catheter was inserted improperly. For the reasons states below, this theory is more speculative than probable.

Dr. Linden did testify that had he received notification of Mr. Johnson's abnormal

14

urinalysis on January 18, 2002, he would have immediately tried to recall Mr. Johnson to Bay Pines VA for further testing. Because Mr. Johnson's urine glucose level was high, he would have tested Mr. Johnson's blood to determine if his blood glucose was also elevated. However, Dr. Linden also testified that because Mr. Johnson was not experiencing any symptoms of diabetes or any symptoms of DKA on January 18, 2002, he is uncertain as to what level Mr. Johnson's blood glucose level would have been, since there is not a direct correlation between a high urine glucose level and a high blood glucose level. Dr. Linden testified that it was unlikely that Mr. Johnson would have been hospitalized at Bay Pines VA on January 18, 2002 even if he had been recalled and found to have had a high blood glucose, because Mr. Johnson was not experiencing any real symptoms that would require hospitalization.

Plaintiff's experts, Dr. Willey and Dr. Shahady, testified that in their opinion there is a definite correlation between a high urine glucose level and a high blood glucose level. Therefore, Mr. Johnson's urine glucose level of 1,000 mg/dL indicated that he also would have had a high blood glucose level. Dr. Willey opined that on January 18, 2002, due to his high urine glucose level along with the presence of ketones, Mr. Johnson was in the early stages of DKA. Dr. Willey testified that since Mr. Johnson was not treated for DKA when he was at Bay Pines VA, his condition would have deteriorated by the time he was admitted to Bayfront the next night and that in order to treat this condition, the doctors at Bayfront placed Mr. Johnson on an IV insulin drip. After Mr. Johnson's initial IV failed, the doctors at Bayfront attempted to place a central venous line in his femoral vein, and in doing so, lacerated Mr. Johnson's vein. If Mr. Johnson had been called back to Bay Pines VA on January 18, 2002, he would have received treatment for DKA there, and would never have gone to Bayfront on January 19, 2002.

Plaintiff's expert, Dr. Shahady, testified that in his opinion Mr. Johnson had most likely been diabetic since November 15, 2001, when he was first admitted to Bay Pines VA for a stroke, and that Dr. Linden's and Bay Pines VA's failure to diagnose and treat Mr. Johnson's diabetes contributed to his deterioration.  Dr. Shahady also testified that a urine glucose level of greater than 1,000 mg/dL correlates to a blood glucose level of 600 mg/dL or more, which equates with glucose toxicity.  Therefore, on January 18, 2002, while at Bay Pines VA, Mr. Johnson was in a state of glucose toxicity.  In the opinion of Dr. Shahady, the extremely high glucose level in Mr. Johnson's blood caused plaque to loosen or rupture, and led to Mr. Johnson's heart attack.  Dr. Shahady concluded that in his opinion if Mr. Johnson had been treated for his high glucose levels beginning in November of 2001 and certainly on January 18, 2002, his blood glucose level could have been brought under control, and he would not have suffered a heart attack on January 19, 2002,  and would not have ended up at Bayfront hospital.

In contrast to Plaintiff's experts, Defendant's expert, Dr. Orban, testified that there is nothing in Mr. Johnson's Bay Pines VA records to suggest that he was diabetic in November 2001.  Furthermore, Dr. Orban, Dr. Emancipator, and Dr. Linden all testified that there is no direct correlation between a high urine glucose level and a high blood glucose level.

Finally, even assuming Mr. Johnson did have a high blood glucose level on January 18, 2002, Defendant's experts Dr. Orban and Dr. Emancipator testified that high blood glucose cannot cause plaque to rupture or loosen thereby causing a heart attack as Dr. Shahady suggested.  They testified that diabetes can contribute to overall heart disease over the long term, but it cannot cause a heart attack in the short term.  Dr. Orban who is the director of emergency medicine at Tampa General Hospital testified that even if Mr. Johnson had been urgently

16

recalled to Bay Pines VA on January 18, 2002, found to be hyperglycemic and treated with insulin to get his high blood glucose under control, Mr. Johnson would probably not have been admitted to Bay Pines VA, since treatment for this condition did not require admission to a hospital.  Furthermore, Dr. Orban testified that even if Mr. Johnson had been treated for a high glucose level at Bay Pines VA on January 18, 2002, he would still have suffered the heart attack the next day and still have been admitted to Bayfront, because a high glucose level and the heart attack that Mr. Johnson suffered were not related.

      Mr. Johnson's chief complaint upon his arrival at Bayfront on January 19, 2002 was chest pains.  (Bayfront Medical Record 2), and he was diagnosed as having suffered a heart attack.  (Bayfront Record 2).  Dr. Orban, Dr. Emancipator, and Dr. Linden all testified that in their opinion Mr. Johnson's development of DKA and the onset of diabetes were triggered by his heart attack rather than the heart attack being triggered by DKA or diabetes.  As a direct result of his heart attack, Dr. Orban and Dr. Emancipator testified that in their opinion Mr. Johnson was in the early stages of DKA at the time of his admission to Bayfront on January 19, 2002.  They testified that the Bayfront records indicated that his arterial blood gas PH level was 7.27, indicating a mild state of acidosis, and that Mr. Johnson was in an early state of DKA.  Dr. Willey, Plaintiff's expert, also testified that Mr. Johnson's blood gas PH level indicated that he was mildly acidotic upon admission to Bayfront and his condition deteriorated rapidly.

      Dr. Emancipator and Dr. Orban testified that the onset of DKA occurs rapidly, so if Mr. Johnson was experiencing DKA when he was at Bay Pines VA at approximately 9:30 a.m. on January 18, 2002, he would have most certainly been in an advanced state of DKA when he was admitted to Bayfront at approximately 7:50 p.m. on January 19, 2002.  (Bay Pines Record 25;

17

Bayfront 37). Since he was not, it was Dr. Orban and Dr. Emancipator's opinion that Mr. Johnson would not have been experiencing DKA when he was at Bay Pines VA on January 18, 2002. This opinion is supported by Mr. Johnson's medical records at Bayfront wherein the diagnosis of acute DKA appears to have been crossed out (Defendant's Exhibit 2C), and a progress note stating "suspicion of DKA rather low" was inserted. (Defendant's Exhibit 2D).

Plaintiff failed to present evidence that affords the Court a reasonable basis to conclude that the conduct of the Bay Pines VA and/or Dr. Linden was a substantial factor in bringing about Mr. Johnson's death. The Bayfront medical records and trial testimony are unclear as to whether the sole reason that doctors at Bayfront inserted the femoral vein catheter was to treat Mr. Johnson's symptoms associated with DKA. Defendant argues that if the femoral vein catheter would have been used even if Mr. Johnson did not have DKA when admitted to Bayfront, then treating Mr. Johnson for DKA at Bay Pines VA would not have avoided Mr. Johnson's need for a femoral vein catheter after his admission at Bayfront. However, even assuming that the insertion of the femoral vein catheter at Bayfront was for the sole purpose of administering insulin to treat Mr. Johnson's DKA, Dr. Orban, Dr. Emancipator, and Dr. Linden testified that this condition was a direct result of Mr. Johnson's heart attack, which occurred on January 19, 2002 and was independent of any treatment he might have received at Bay Pines VA on January 18, 2002

After considering the trial testimony as well as any exhibits that were received at trial, the Court finds that Plaintiff has established, at best, that there is disagreement among the experts as to what effect any treatment Dr. Linden might have rendered Mr. Johnson on January 18, 2002 would have had on Mr. Johnson's admission to Bayfront on January 19, 2002 and

18

subsequent death. Plaintiff's experts Dr. Willey and Dr. Shahady testified that if Mr. Johnson had been recalled to Bay Pines VA on January 18, 2002 and treated for his high blood glucose, he would not have had a heart attack nor been admitted to Bayfront on January 19, 2002. On the other hand, Defendant's experts Dr. Orban and Dr. Emancipator, as well as Dr. Linden, testified that even if Mr. Johnson had been recalled to BayPines VA on January 18, 2002 because of the abnormal urine test, there is no direct indication that his blood glucose level would have been high. Furthermore, they testified even if Mr. Johnson's blood glucose level was high and he had received treatment for this condition at Bay Pines VA, he most probably would not have been admitted to Bay Pines VA and would still have had the heart attack on January 19, 2002, resulting in the need for treatment and admission to Bayfront.

Therefore, Plaintiff has merely shown that the probabilities of whether or not any treatment administered to Mr. Johnson at Bay Pines VA on January 18, 2002 would have altered the course of events at Bayfront are, at best, questionable. Plaintiff has failed to meet her burden of proof in that she has failed to establish that Bay Pines VA and/or Dr. Linden's conduct was a substantial factor in the cause of Mr. Johnson's death.

## II.     The Family's Claims

Since Plaintiff has failed to prove that Bay Pines VA or Dr. Gregory Scott Linden were negligent, Joanne Johnson's claims of mental anguish, pain, loss of consortium and companionship, loss of past and future support, medical bills, and funeral expenses must also fail. In addition, her claims fail because Plaintiff has failed to prove by the greater weight of the evidence that Bay Pines VA's and/or Dr. Linden's conduct was a substantial factor in the cause of Mr. Johnson's death. Similarly, Mr. Johnson's childrens' claims of mental anguish, pain, loss

of parental companionship and consortium, and loss of past and future support must also fail.[5]

### III.   Verdict

In this trial, the burden of proof was on Plaintiff to prove by the greater weight of the evidence that Bay Pines VA and/or Dr. Gregory Scott Linden departed from the accepted standard of care in their treatment of Sammie Lee Johnson and that deviation was a substantial factor contributing to Sammie Lee Johnson's death.  Plaintiff has not done so.  Plaintiff has failed to prove that Bay Pines VA's decision not to include urine glucose results as a critical value violates the accepted standard of care.  Plaintiff has also failed to prove that Dr. Linden violated the accepted standard of care in his treatment of Sammie Lee Johnson.  Furthermore, Plaintiff has failed to prove that Bay Pines VA's and/or Dr. Linden's conduct was a substantial factor in the cause of Mr. Johnson's death.  Accordingly, it is **ORDERED AND ADJUDGED** that the clerk shall enter judgment in favor of Defendant, the United States of America, as to all claims and **CLOSE** this case.

**DONE AND ORDERED** at Tampa, Florida, this 28th day of March, 2006.

SUSAN C. BUCKLEW
United States District Judge

Copies to:  Counsel of Record

---

[5] Mr. Johnson's children asserting claims in this case are Jonika Johnson, Samuel Marcel Johnson, and Antonio Reche Johnson.